## Case No. 3,657.

### DAVIS v. WALLACE et al.

#### [3 Cliff. 123.] [1]

Circuit Court, D. Massachusetts. May Term, 1868.

DEMURRAGE—ACQUIESCENCE IN DELAY—CUSTOMARY DISCHARGE—CUSTOM.

1. A vessel was chartered under a contract that she was to have "three working days to load" at the port of lading, and quick despatch in discharging at the port of discharge. On arrival at the port of discharge, the master notified the charterers, and was requested to call the following day, and received no orders as to his place of discharge till after the lapse of three days, when he went to the place to which he was directed. Nothing appeared to show that the delay was claimed as a matter of right by the consignees, but rather as a request voluntarily acceded to by the master. *Held*, that the libellant was not entitled to recover the rate of demurrage per diem, stipulated in the contract, for three days' detention.

[Cited in Teilman v. Plock, 21 Fed. 350; McLeod v. Sixteen Hundred Tons of Nitrate of Soda, 55 Fed. 531.]

2. After reaching the wharf designated by the consignees as the place of discharge, the libellant's vessel was detained four days before the unloading was completed: three by reason of the berth at the wharf being occupied by another vessel for whose departure the libellant was compelled to wait; one in consequence of the lack of teams to take the cargo away. *Held*, that libellant was entitled to recover the stipulated demurrage per diem for these four days of delay.

[Cited in Futterer v. Abenheim, Case No. 5,164; Carsanego v. Wheeler, 16 Fed. 254; Gronstadt v. Withoff, 21 Fed. 254. Applied in Williams v. Theobald, 15 Fed. 469.]

3. The contract in this case contained a clause that the cargo should be "received and delivered at the ports of lading and discharging as customary." *Held*, this clause referred to the manner of receiving and delivering the cargo and had no reference to the question whether the libellant's vessel was justly required to wait her turn at the wharf, where she was ordered to discharge by the consignees.

[Cited in Sleeper v. Puig, Case No. 12,940; Lindsay v. Cusimano, 12 Fed. 507; Mott v. Frost, 47 Fed. 84.]

4. Consignees cannot select a place of discharge within a port which would necessitate greater delay in discharging than the charter allowed.

[Cited in O'Rourke v. Two Hundred and Twenty-One Tons of Coal, 1 Fed. 620; Moody v. Five Hundred Thousand Laths, 2 Fed. 609.]

5. Proof of usage at a port, in respect to the reception or delivery of a cargo may be received to interpret the meaning of obscure or equivocal language in a contract, or in the absence of express stipulation, but demurrage is a matter of contract, the provisions of which usage cannot modify.

[Cited in Fish v. One Hundred and Fifty Tons of Brown Stone, 20 Fed. 202.]

Admiralty appeal. Libel [by Samuel L. Davis against William W. Wallace] for demurrage. The schooner Samuel Fish was chartered by the libellant to the respondents, to bring a cargo of coal from Georgetown or Bal-

---

[1] [Reported by William Henry Clifford, Esq., and here reprinted by permission.]

timore, as they might elect, to Boston, at a certain freight per ton, and it was agreed that the respondents should have three working days to load at Georgetown, and quick despatch in discharging at Boston. In case the vessel should be longer detained, they were to pay demurrage at the rate of $35 per day, provided such detention should happen by their own or their agent's default. It was further agreed that the cargo should be received and delivered as customary, at the ports of loading and discharging. The schooner took a full cargo of coal at Baltimore, July 7, 1863, and arrived at Boston, Thursday, the 23d of July. The master promptly reported his arrival to the charterers. When informed that the schooner had arrived, they replied that they had nothing to do with the cargo, and referred the master to the shippers and consignees. Due notice was given the consignees, and they informed the master that the cargo was not sold, and requested him to call again, on the next day, which he did. On Saturday, following the arrival of the schooner, the consignees directed the master to proceed to a certain wharf in South Boston to discharge. He reached the designated wharf on Sunday, but finding another vessel, which had not commenced to unload, he notified the charterers that he had no place at which to unload his vessel. The libellant's vessel, however, lay there until the following Thursday, when the vessel that had previously occupied the berth at the wharf went away, and the Samuel Fish hauled up and commenced to discharge. She commenced to discharge in the afternoon, but was delayed one day for want of teams to take away the cargo, and did not complete the discharge until the following Thursday. Damages were claimed by the libellant for failure to comply with the stipulations of the charter-party. In the district court a decree was entered in favor of the respondents. [Case not reported.]

J. C. Dodge, for libellant.

First. Did this vessel have "quick despatch," according to the contract? Second. If she did not, did the detention happen by the default of the charterer?

1. Let us first ascertain the meaning of the term "quick despatch," in its application to the loading and discharging of vessels. The law seems to be settled, that in the absence of any express contract authorizing delay in discharging, or usage so well settled and uniform as to raise an implied contract, the consignee is bound to receive the cargo as soon as he is notified of the readiness of the carrier to deliver it. No doubt, in this as in every other case of a contract in which time of performance is not stated, we may apply the formula of "reasonable time," but this does not imply delay for the convenience or profit of the consignee, any more than in land carriage. The contract is, to carry and deliver the cargo. There is nothing in it au-

thorizing the consignee to use the vessel as a storehouse. The liabilities of a carrier are very onerous, and are not to be protracted beyond the contract. If the cargo is not received by the consignee when offered, it remains in possession of the carrier, not as carrier, but as bailee in deposit. But the carrier has not stipulated to assume this new relation to the cargo; and if he does so at the request or for the convenience of the consignee, the law implies a promise of payment for this new service. Clendaniel v. Tuckerman, 17 Barb. 184, and the cases there cited; Salmon Falls Manuf'g Co. v. The Tangier [Case No. 12,265]; Richardson v. Goddard, 23 How. [64 U. S.] 28, 40. Such being the legal rights of the parties without a special contract, and in the absence of usage, it cannot reasonably be pretended that less than this was intended when they contracted for "quick despatch." The truth is, that these words were inserted in the contract, to guard against being detained by virtue of a usage that has grown up in Boston, to wait three days, in the absence of a contract, before having a berth at which to discharge. The purpose was, to give this vessel the same rights she would have had by law, without the usage.

2. Was this detention by the default of the charterers or their agents? The term means failure on the part of the charterers to perform what they are bound to perform by the charter. If the vessel does not have "quick despatch" because the charterers, or persons standing in their place, fail to receive the cargo, the demurrage is due. If the delay is caused by neglect on the part of the vessel to deliver the cargo, then it would not be due. See the use of the term in Abb. Shipp. 307. See Randall v. Lynch, 2 Camp. 352–356. Under our charter with the defendants, a cargo is taken on board consigned to Lewis Audenried & Co., at Boston, but no particular wharf is specified. We arrive; the defendants refer us to the consignees, who order us to How's wharf at South Boston. And there most of the detention takes place. Our claim is, that when we reported, we should have been sent at once to a berth where unloading might be commenced without delay, and that the cargo should have been received without interruption for want of teams. It seems a practice has grown up in Boston for a vessel arriving with coal under the ordinary bill of lading only, without a charter or any stipulation as to time of discharging, to wait three days, if the consignee desires it, for him to sell the coal. I do not stop to inquire whether this is a good custom, because, under our stipulation for "quick despatch." the custom has no application to us. It cannot control our express contract. The Reeside [Case No. 11,657]; Macomber v. Parker, 13 Pick. 176, 182. It will be found that in every case relied upon by respondents, that the vessel had undertaken, expressly or by implication, to load or unload her cargo at a particular wharf or dock.

David Thaxter, for respondents.

Upon all the evidence, it is therefore fair to say that these facts are not in controversy, to wit: That coal-laden vessels discharge at coal wharves to which they are assigned. That the capacity of these wharves is limited. That the peculiarities of the trip often bring a large fleet of vessels here, requiring them to wait their turns at the wharves at which they are to discharge. That vessels do invariably wait their turn in discharging, upon being assigned a wharf. Now it is well settled that in the absence of any express agreement, fixing the time for unloading, the law implies a contract to unload in the usual and customary time for unloading such a cargo, having reference to the usual and customary manner of discharging, such as waiting turns, at the port of discharge. Rodgers v. Forresters, 2 Camp. 483; Burmester v. Hodgson, Id. 488; Nichols v. Tremlett [Case No. 10,247]; 2 Holt, Shipp. 27; Maude & P. Shipp. 177; Lawes, Chart. Part. 133; Macl. Shipp. 445; Harris v. Dreesman, 25 Eng. Law & Eq. 526; Parker v. Winlow, 7 El. & Bl. 942. It appearing, therefore, that the waiting for turns is a matter of frequent constant occurrence at this port, and that it is the invariable rule for vessels to wait their turn in discharging, to entitle the libellant to recover for any detention thus caused, he must show an express agreement to pay for such detention, or such a well-established and recognized usage to pay so known to the trade as to be recognized and treated as part of the contract. It is to be borne in mind that respondents' sole liability for any detention rests upon this proviso: "Provided such detention shall happen by default of the said parties of the second part (the respondents) or their agent." This clause, peculiar to American charter-parties, has received a judicial construction by the state court,—the only construction of which it is capable if it is to have any operative value in the contract. Towle v. Kettell, 5 Cush. 18. It appears, by the first article of the libel, admitted in the answer, that the libellant, the master of the schooner, sailed her "on shares," having the exclusive management, navigation, and control of her. That this created him owner pro hac vice of the schooner is well settled. Thomas v. Osborn, 19 How. [60 U. S.] 22; Webb v. Peirce [Case No. 17,320]. Having this authority as owner, he made this charter with the defendants, and with the same authority he made the contract with L. Audenried & Co. to transport and deliver the coal in question according to the terms of the bill of lading then signed by him, and under which it was shipped. Even if he had not been, as he was, owner pro hac vice, but merely master, yet under this charter-party the custody of the vessel would remain in her owners, and the master

would be their agent, and in giving this bill of lading the owner would be bound thereby as against the shippers. The Freeman v. Buckingham, 18 How. [59 U. S.] 182. Now, this bill of lading is in the usual form, without any stipulation in regard to the time and manner of delivery, and, therefore, requires the master to deliver, and the shippers or consignees to receive, as, and only as, customary; that is, in the time which would be required to discharge her in the usual and customary manner; and this cargo, as has been seen from the testimony, was so discharged and received. It is submitted, however, that, by the true construction of the charter-party, the contract for delivery is substantially the same as that which the law implies in the absence of any express agreement, as in the case of an ordinary bill of lading. The manner of delivery must necessarily affect the time in which delivery can be made, and any provision for the quick despatch of a vessel, which also provides that such delivery shall be made in the customary manner, can only be interpreted with reference to the manner in which the vessel is discharged. Plenary evidence that such was the construction intended by the parties may be found in the provision in regard to the lading of the vessel. It cannot be doubted that the time actually required to discharge a cargo of coal, the vessel having a berth and all the conveniences for discharging, was known to the libellant, who was familiar with the trade; yet, while he limited the exact time for loading, for discharging he stipulated that she should be discharged in the customary manner with quick despatch. It is obvious that the parties agreed that the vessel should discharge as other vessels discharge, but that there should be no default in the defendants while thus discharging her to give her quick despatch.

CLIFFORD, Circuit Justice. Thirteen days elapsed in the efforts to secure a berth and in discharging the cargo, without reckoning the day of the arrival or the day the discharge was completed. Prior to the directions given to proceed to the wharf at South Boston, it may reasonably be inferred that the master acquiesced in the neglect to designate a place for the discharge of the cargo; and if so, then the day of the arrival of the schooner and the Friday and Saturday following should be deducted. Perhaps Sunday was spent in getting to the wharf and in preparations for unlading. Whether the second notice to the charterers was given on Sunday afternoon or Monday morning does not appear; but computing the delay in the most favorable light for the respondents, it is clear that there was a loss of three, if not four, full days for the want of a place to discharge and deliver the cargo before the stevedores were able to commence the work. They also lost one day afterwards for the want of teams to take the coal away, making at least four days of unnecessary delay, for which the respondents are clearly responsible, unless the defence set up in the answer can be maintained. Payment for six days' delay is claimed in the libel, but it seems to the court, for the reasons already suggested, that none of the time prior to the arrival of the schooner at the wharf in South Boston should be reckoned against the respondents. The defence set up in the answer is, that the schooner on her arrival was directed to a certain wharf to discharge, that she had a berth at that wharf in her regular turn, and that the master was enabled to commence the discharge of the vessel within the time and in the manner established by the usage and custom of the port for the unlading of vessels engaged in the coal and other coasting trade. The admission of the answer also is, that the schooner, when she proceeded to the wharf where she was directed to discharge, found the berth occupied by another vessel, and was obliged to wait for a turn until that vessel completed her discharge, and the period of delay, as stated in the answer, is somewhat longer than is shown in the proofs. A delay beyond what is ordinarily necessary during the discharge of the vessel is also admitted in the answer, but it is ascribed to the inability of the consignees to obtain stevedores, in consequence of the extreme heat and large arrival of coal, and not to the want of teams to remove the coal, as alleged in the libel. The respondents in argument make two points of defence on which they chiefly rely: First, they contend that the consignees had a right to select the wharf where the schooner was to discharge, and that if the berth was occupied by another vessel when she arrived there, she was bound to wait her turn without any charge for demurrage; second, that vessels arriving at this port loaded with coal not previously sold by the consignees are, if requested, obliged by the usages of the port to wait three days before commencing to discharge, to give the owners of the coal an opportunity to effect a sale. Whether the consignees effected a sale of the coal before they designated a place for discharging the same does not appear, but it does appear that the wharf designated belonged to a third person, and was not one occupied by the consignees. Undoubtedly the consignees, as the agents of the charterers, had a right to designate the place where the vessel should discharge the cargo, but it must be one within the terms of the charter-party. They could not go out of the port of destination, nor could they select one within the port which would involve greater delay in discharging than the charter allowed. Express reference was made in the bill of lading to the charter-party, so that the consignees had no greater rights than the charterers. The charterers were allowed "three working days to load" at the port of departure, and they stipulated to make

"quick despatch in discharging at" the port of destination; and the consignees had the same rights and were bound by the same obligations. Reference is made by the respondents to the stipulation in the charter-party that the cargo "shall be received and delivered at the ports of loading and discharging as customary." But it is evident that that clause refers to the manner of receiving and delivering the cargo, and that it has nothing to do with the question under consideration. Where there is no special contract, the usage of the port in respect to the reception and delivery of the cargo, in controversies between the ship-owner and the consignee, is frequently a very material consideration; but demurrage is a matter of contract, and it is well-settled law that usage cannot prevail over or nullify the express provisions of a contract. Bliven v. New England Screw Co., 23 How. [64 U. S.] 431; Add. Cont. 970. Proof of usage is admitted either to interpret the meaning of the language of the contract or to ascertain its nature and effect in the absence of express stipulation, and where the meaning is equivocal or obscure; but the proof of usage is not admitted to contradict express stipulations, or to vary the language employed by the parties where their meaning is expressed in plain and unambiguous terms. The Reeside [Case No. 11,657]. Such delay as occurred before the schooner arrived at the wharf designated by the consignees will be left out of view at present, and will be separately considered in examining the second ground of defence. First defence is, that the schooner was properly required to wait her turn at the wharf where she was directed to discharge by the consignees. By the terms of the charter-party the schooner was entitled to quick despatch at the port of discharge; and the libellant contends that the proposition of the respondent is in direct conflict with the stipulation of the charter-party. Demurrage is the sum fixed by the contract of affreightment as a remuneration to the ship-owner for the detention of the ship beyond the lay-days allowed for loading or unloading the vessel. Maude & P. Shipp. 176; Pars. Mar. Law, 261. Stipulations are usually inserted in charter-parties and bills of lading, to prevent disputes and define the rights of parties in case of unforeseen delays in loading or unloading, specifying that a certain number of days called running or working days are allowed for that purpose, and it is frequently stipulated that the charterer or freighter may delay the ship for a further specified time at an agreed price per day for such over-time. Sometimes the contract is, that the vessel shall be loaded and discharged in the usual time, or within a reasonable time after her arrival in port, or that the freighter shall be allowed the usual and customary time to load or unload at the port of loading or discharge. In other cases the contract of affreightment is without any such definite condition; but even in those cases the owner, if the ship is improperly detained, may frequently have a special claim to damage in the nature of demurrage. The settled rule is, where the contract of affreightment expressly stipulates that a given number of days shall be allowed for the discharge of the cargo, that such a limitation is an express stipulation that the vessel shall in no event be detained longer for that purpose, and that if so detained, it shall be considered as the delay of the freighter, even where it is not occasioned by his fault, but was inevitable. Field v. Chase, Hill & D. 51. Where the contract is, that the ship shall be unladen within a certain number of days, it is no defence to an action for demurrage that the overdelay was occasioned by the crowded state of the docks, or by port regulations, or government restraints. Detention of the vessel for loading or discharging longer than the time allowed by the contract entitles the owner to the stipulated demurrage, although it was impossible to complete the work within that time by natural causes. Randall v. Lynch, 2 Camp. 352; Barret v. Dutton, 4 Camp. 333; Hill v. Idle, Id. 327; Furnell v. Thomas, 5 Bing. 188. Much reliance is placed by the respondents upon the case of Rodgers v. Forresters, 2 Camp. 483; and also upon the case of Burmester v. Hodgson, Id. 488; but it is quite clear that they are not applicable to the present case, unless it be held that the words "quick despatch in discharging" have no meaning whatsoever. Stipulations, express or implied, that the ship shall not be detained beyond the period or periods specified in the contract of affreightment are not controlled by the usage of the port where the vessel is to load or discharge; and if the freighter detains the vessel beyond the time specified, he is liable to an action on the contract adapted to the nature of the instrument and the practice of the jurisdiction where the suit is brought. Abb. Shipp. 303; Clendaniel v. Tuckerman, 17 Barb. 184. Just prior to the arrival of the plaintiff's vessel an unusual number of other vessels arrived at the defendant's wharf for the purpose of discharging their cargoes. They had been held back for a time by a storm, but being first at the wharf they were entitled to priority in turn. The consignee had but one wharf, and he offered to prove the circumstances at the trial, as an excuse for the delay, but the judge excluded the evidence, and the court of appeals held that it should have been admitted. A direct admission, however, is made in the opinion that the defendant would be liable, if he was in fault, in suffering such an accumulation of craft, laden with cargo for himself, for the same wharf, at the same time. But the court also ruled that where there is an express contract, the parties are held strictly to its terms, and that no excuse, as a general rule, is available in such cases for delay; considering that the whole delay in that case did not exceed two days,

it may be that the decision is correct, upon the ground that the discharge, in view of the circumstances, was within a reasonable time. Conceding the correctness of that decision, still it cannot affect the case at bar, as by the express terms of the charter-party the owners of the vessel were entitled to quick despatch in discharging, and it cannot be admitted that thirteen days' delay was not a violation of that provision. Parties may contract as they please, but their contracts must be construed and executed as they are made. They may contract that the ship shall wait any number of days before commencing to load or discharge, and that the freighter shall have any number of lay-days, with or without charge, or none at all, or that the ship shall load or discharge in turn; but any such special arrangement, enlarging the time for loading or discharging, is matter of special contract. Even the covenant to load with usual despatch excludes every delay on the part of the shipper beyond "the ordinary time for bringing the cargo to the place of landing and loading." Kearon v. Pearson, 7 Hurl. & N. 386. Viewed in the most favorable light for the respondents, it must be understood that the stipulation for quick despatch in discharging excludes all delay save the time employed in unloading and delivering the cargo, except what is occasioned by natural causes beyond the control of the party contracting. Such exception was denied in the case of Kearon v. Pearson, and it is clear that it cannot be admitted where the covenant is only for usual despatch; it cannot be admitted in cases like the present. The power to designate the place of discharge belongs to the consignee, but he is bound to select a place where the ship will encounter no delay beyond the time necessary for the unloading of the vessel where the delivery and reception of the cargo is required by law. The Eddy, 5 Wall. [72 U. S.] 490; The Bird of Paradise, Id. 545. Delay beyond that, if occasioned by natural cause over which the defendant has no control, may, perhaps, be excused in a case where there is no express contract as to time, but that question does not arise in this case, and no decided opinion is expressed upon the subject. Enough has already been remarked to show that, in the view of the court, the second question presented by the respondents does not arise in the case, for the reason that the master appears to have acquiesced in the delay without complaint or notice to the respondents that he should hold them responsible. When told that the coal was not sold, and requested to call on the following day, if he did not intend to acquiesce in the consequent delay, he ought to have said so, or in some manner to have signified to the consignees that he did not waive the right of the ship-owner. Nothing appears in the record to warrant the conclusion that the delay at that time was claimed by the consignees as matter of right; but in view of the circumstances it is much more reasonable to infer that it was but a request, and as such was voluntarily acceded to by the master. Regarded as a claim of right, very strong doubts are entertained whether it could be sustained in any case, and it is quite clear that such a usage, if proved, can never avail as a defence where it comes in conflict with the terms of the contract. Usage is never held to make a contract, and proof of it will never be admitted to contradict a contract expressed in clear and unambiguous terms. The libellant is entitled to recover for four days' unnecessary delay of the schooner in discharging at the port of destination.

The decree of the district court is reversed, and let a decree be entered for the libellant.