## LINDSAY, GRACIE & Co. v. CUSIMANO.*

*(Circuit Court, E. D. Louisiana. May 27, 1882.)*

1. **CHARTER-PARTY—CUSTOMARY DISPATCH.**

   When a charterer is allowed to select the wharf of discharge, but is bound to be ready to receive the cargo at the ship's side, and to discharge with customary dispatch, with stipulated demurrage, he is liable for delays caused by selecting a wharf already fully occupied.

2. **CUSTOM.**

   To render a custom or usage of trade valid and binding, it must be known, certain, uniform, reasonable, and not contrary to law. An alleged custom of the port of New Orleans, by which the cargo of a fruit vessel is commenced to be discharged for one day upon the wharf, and then the further discharging is delayed for one day to sell that part discharged, and then, if necessary, is further delayed another day to remove the same from the wharf, before proceeding to further discharge the cargo, condemned as unreasonable.

3. **"CUSTOMARY DISPATCH IN DISCHARGING."**

   "Customary dispatch in discharging" means discharging with speed, haste, expedition, due diligence, according to the lawful, reasonable, well-known customs of the port of discharge. It is the same as "usual custom," but not the same as "quick dispatch," which latter has been held to exclude certain usages and customs.

4. **EVIDENCE AS TO WEATHER—UNITED STATES SIGNAL OFFICER'S RECORD.**

   The record of the weather, kept by an officer of the United States signal service, is better evidence thereof than the testimony of witnesses who, having kept no record, afterwards swear to the state of the weather from memory.

Admiralty Appeal.   On petition for rehearing.

For facts, see same case, 10 FED. REP. 302, and *ante*, 503.

*Joseph P. Hornor* and *Francis W. Baker*, for libellants.

*Charles B. Singleton* and *R. H. Browne*, for defendant.

*Reported by Joseph P. Hornor, Esq., of the New Orleans bar.

PARDEE, C. J. The earnestness with which proctors for defendant have pressed for a rehearing in this case has induced me to go over the matter again and to amplify my reasons for judgment. The whole case rests upon the amount of time allowable under the contract for discharging the cargo of the Glenbervie.

The following are the specifications of the contract in relation to discharging :

" To discharge at a wharf as ordered by charterers' agents, or so near thereto as she may safely get, and there deliver the same agreeably to bills of lading.

" To discharge with customary dispatch, and shall pay damage at the rate of 30 pounds sterling per day," etc. See charter-party, Record, pp. 11, 12, 13.

" Simultaneously with the ship's being ready to unload the above-mentioned goods or any part thereof, the consignee of the said goods is hereby *bound to be ready to receive the same* from the ship's side, either on the wharf or quay at which the ship may lie for discharge, or into lighters provided with a sufficient number of men to receive and stow the said goods therein," etc. See bill of lading, Record, p. 281.

These provisions are inconsistent with any delay in discharging after the ship was ready, except such delays as are involved in customary dispatch. The defendant selected a wharf already occupied by the Caraidoc, and the Glenbervie landed outside. The defendant alleges that it was very difficult, if not altogether impracticable, to discharge the cargo of the Glenbervie over and across the decks of said vessel Caraidoc, and when the Caraidoc got out of the way, and the Glenbervie came to the wharf, "the wharf was then and there so much obstructed by goods and merchandise landed and being landed from other vessel or vessels, that it was not possible to unload the cargo of the steam-ship Glenbervie as is usual, customary, and proper at this port." These excuses are relied upon to justify a delay from January 27th to January 31st.

It seems perfectly clear to me that defendant had no business to select a wharf already fully occupied, (see 2 Low. 361;) and under his contract he was bound to be ready to receive the cargo as soon as the ship was landed and ready to deliver. He might have delayed the Glenbervie for weeks with the same excuses.

The case of *175 Tons of Coal*, 9 Ben. 400, is not applicable here, because in that case the contract specified the wharf, and there was no stipulation of the dispatch or delays to be used in discharging. The boat having agreed to unload at a particular wharf named, and being there detained only to await her regular turn, and there being no stipulation of dispatch in discharging, the libellants were not allowed to recover. Nor are the cases cited, that in cases where the

words "customary dispatch" were used in a charty-party a custom of allowing three days to procure a berth in the port of New York became a part of the contract, applicable here. See *Fulton* v. *Blake*, 5 Biss. 371. In this case there is no custom allowing a ship three days to procure a berth in the port of New Orleans alleged or proved. Besides, the Glenbervie found her landing immediately, and the consignee had agreed to be ready to receive simultaneously with the ship's being ready to deliver cargo, and he was to receive it on the ship's side.

In excuse for further delays the defendant, though not alleging in his answer, had offered evidence to show a custom in the fruit trade in the port of New Orleans to discharge cargo for one day on the wharf, and then delay one day to sell the same, and then, if necessary, another day to remove. Such a usage has been shown to prevail in this port for three or four years, but it is alleged in argument that it is now superseded, as interested parties have provided a suitable covered wharf. It never was a reasonable custom, even if it had acquired the authority of a custom at all, which is doubtful. "Customs result from a long series of actions constantly repeated, which have, by such repetition, and by uninterrupted acquiescence, acquired the force of a tacit and common consent." La. Civ. Code, art. 3. "Custom is unwritten law, established, by common consent and uniform practice, from time immemorial." 2 Greenl. § 248. But waiving the question as to whether this practice of delay had attained, so far as usage is concerned, the dignity of a custom, it is sufficient to condemn it as unreasonable. That a ship should be delayed in discharging until the consignee can find purchasers for his goods, is to convert the ship into a temporary warehouse, according to the necessities of the consignee. "To render a custom or usage of trade valid and binding, it must be known, certain, uniform, reasonable, and not contrary to law." 1 Wait, Act. & Def. 129, and cases there cited.

The case of *Smith* v. *Sixty Thousand Feet of Pine Lumber*, 2 FED. REP. 396, relied upon by proctors for defendant, goes only to the extent of restricting the discharge of cargo to such amount as the consignee can, with the use of ordinary facilities, according to the customs of the port, receive and take away. The contract in that case was for "customary dispatch in discharging," and the judge defined a custom to be "a practice which is universal, or almost universal, in the trade in question." In this case "customary dispatch in discharging" is qualified and affected by the stipulations in the

bill of lading. And here I may notice that not one of the many cases referred to by proctors for respondents is identical, in contract and circumstances, with this case, nor is there any conflict in principle with any of those cases in the views the district judge and I take of this case.

Our decisions can be maintained on principle, sustained by authority, if we concede this entire case to turn on the "customary dispatch" of the port of New Orleans. The lawful, reasonable, and well-known customs of the port of New Orleans affecting the contract in this case for customary dispatch, etc., are the customs not to discharge on Sundays, nor in the rain, and not any unreasonable practices allowing consignees delays to sell goods.

"Customary dispatch in discharging" I understand to mean discharging with speed, haste, expedition, due diligence, according to the lawful, reasonable, well-known customs of the port of discharge. It is the same as usual dispatch, not the same as quick dispatch, which latter has been held to exclude certain usages and customs. *Davis* v. *Wallace*, 3 Cliff. 123; *Thacher* v. *Boston Gas-light*, 2 Low. 362; *Keen* v. *Audendried*, 5 Ben. 535.

With regard to the time allowed in this case for rain, it is urged that I ought not to have considered the testimony of the United States signal officer as the best evidence to be had.

I only put the evidence of the signal officer as the better evidence when opposed to those witnesses who, having kept no record, some time afterwards swore to the state of the weather from memory, and I think there can be no doubt of the correctness of this position. Proctors for the defendant, or else I, mistake the effect of the signal officer's testimony, for it was on his record that I allowed one day for rain.

The testimony for respondent does not reliably show any rain before Thursday, by which time the cargo should have been fully discharged. Courtrault, discharging clerk, swearing from his book, mentions no rain before Thursday. The ship's mate, testifying with the ship's log before him, says it rained on Tuesday. This is in corroboration of the signal officer. And not another single witness that I discover swears by recollection to rain on any particular day before Thursday, and the evidence generally of all such witnesses in this case is abuse of the weather.

The application for a rehearing is denied.