## THE SCANDINAVIA.

### COMPAGNIE DU BOLEO *v.* THE SCANDINAVIA.

### MEEK *v.* CARGO OF THE SCANDINAVIA *et al.*

*(District Court, N. D. California.   February 23, 1892.)*

1. SHIPPING — DISCHARGE OF CARGO — REFUSAL BY CONSIGNEE TO RECEIVE — DUTY OF SHIP.
    Where a consignee refuses to receive cargo in accordance with the provisions of the charter-party, the ship-master is authorized to land and store it at the nearest proper and convenient port, having reference to his own convenience and the apparent best interests of its owner, and always acting prudently and in good faith.

2. SAME — LIGHTERS DESTROYED BY STORM — STATEMENT OF CASE.
    The ship S., whose charter provided that her cargo should be delivered at the ship's side, lay in the roadstead of Santa Rosalia, and had discharged only about one-half of her cargo when her lay days expired, and the following day the lighters of the consignee were destroyed by a storm. The only method of discharging was into lighters. The place was an open roadstead, dangerous in the event of bad weather. A week later, despite the necessary protests, the consignee had done nothing, and still refused to do anything, towards discharging the balance of the cargo. On that day, after asking the consignee to designate a port where the balance of the cargo could be discharged, which the consignee refused to do, the vessel sailed for San Francisco, and on arrival discharged and libeled the cargo for freight and demurrage. *Held*, that under the circumstances the ship was justified in taking the cargo to some place where it could be stored for the benefit of the consignee, subject to the payment of freight and charges.

3. DEMURRAGE — MUTUAL NEGLECT.
    A vessel took a cargo to Santa Rosalia; her charter providing that it was to be discharged along-side "any craft, steamer, or floating depot, or any wharf or pier, where she can always safely lie afloat." There is only an open roadstead at Santa Rosalia. The cargo was not discharged within the lay days, partly because the buckets used by the ship were insufficient and her supply of men short, and partly because the lighters furnished by the consignee, and which were the only means of discharging, were inadequate for the purpose. *Held*, that neither ship nor consignee should be allowed demurrage for such period.

In Admiralty. Libel for damages for non-delivery of cargo. Cross-libel for non-reception of cargo and non-payment of freight and demurrage.

*Page & Eells*, for libelant.

*E. W. McGraw*, for claimant.

Ross, District Judge. These are cross-libels; the Compagnie du Boleo claiming demurrage and damages for non-delivery of cargo; and the owner of the ship, damages for non-reception of cargo and non-payment

of freight and demurrage. The Scandinavia was chartered by the company in England to carry a cargo of about 600 tons of coke from Cardiff, Wales, to Santa Rosalia, Lower California, and there deliver the same to the agents of the company "along-side any craft, steamer, or floating depot, or any wharf or pier, where she can always safely lie afloat, as may be directed by the freighter's agents, to whom notice is to be given of the vessel's readiness to discharge." The cargo in fact consisted of 602 tons. The charter-party contained the following, among other, provisions:

"(1) All notices required to be given by the charter-party shall be in writing, and time shall not commence to count until twenty-four hours after delivery. (2) The cargo to be discharged at the rate of not less than 80 tons per working day, weather permitting; time to commence when the vessel has been reported at the custom-house, and has given notice of her readiness to be discharged. (3) The act of God, * * * bad weather, * * * all unavoidable accidents or hindrances in procuring, loading, $\frac{and}{or}$ discharging the cargo, * * * always excepted. (4) Demurrage over and above the said laying days at fifteen shillings per like hour."

The ship arrived at Santa Rosalia on Sunday, January 25, 1891. The next morning, Monday, her master went ashore, entered the ship at the custom-house, and about noon of the same day notified the consignee of his readiness to discharge the cargo. The proof shows that Santa Rosalia is a small, out-of-the-way place, the principal business of which is that of the Compagnie du Boleo,—a company engaged in mining copper. All of the cargoes consigned to the place are consigned to that company. There is no harbor there, but an open roadstead, in which vessels are subject to much danger in case of bad weather. At one time there was a wharf there, at which the cargoes were discharged; but in February, 1890, before the making of the charter-party in question, the wharf was destroyed. After the making of this charter-party, and before the arrival of the Scandinavia at Santa Rosalia, the Compagnie du Boleo provided a number of small lighters, constructed of iron, with water-tight compartments, and containing two rows of four buckets each, into which to put the cargoes to be discharged. These lighters were of the capacity of from three and one-half to four tons of coke each. They were too small to admit of it being sent from the ship into them through chutes, so that the only safe method was to lower it into the lighters by means of the baskets or buckets with which it was taken from the hold of the ship; and that method was pursued in this instance. The ship commenced discharging on the 27th of January. The case shows that the respective parties agreed that the lay days expired with Saturday, February 7th. After that each party commenced claiming demurrage of the other. When the lay days expired, less than half of the cargo had been discharged; there still being in the ship 332 500-2240 tons. Sunday, the 8th of February, the owner of the ship arrived from Guaymas, and on the same day a storm arose, which became so violent by Monday that a number of the lighters were sunk, and the remaining ones beached and damaged. With Tuesday, February 10th, commenced complaints by both parties; each claiming that the other was and had been at fault,

and demanding demurrage, damages, etc. Prior to that time the only complaint made was by the agent of the company to the master, that he was unnecessarily delaying the discharging, to which the latter responded that he was doing the best he could. This was during the lay days. Commencing with February 10th, and thereafter daily, to and including February 14th, the owner of the. ship, through the master, demanded demurrage, and that the consignee provide means for discharging the balance of the cargo; the consignee responding that if the master had exercised proper diligence during the lay days the cargo would have been discharged during those days, and that, the storm having afterwards sunk some and disabled others of the lighters, the company could not for the time being furnish the means for further discharging, and could not say when it could do so. Commencing with February 10th, the consignee's agent also made daily demands on the ship for demurrage. This condition of affairs continued until the night of February 14th, at which time the ship left for San Francisco without being cleared; the customs officer at Santa Rosalia refusing to clear the ship until she had fully discharged her cargo. The departure of the ship was by the order of the owner; her master protesting against going, and entering his protest in the ship's log. Before leaving, the master, by direction of the owner, requested the consignee to designate a port at which the balance of the cargo should be discharged; but this the consignee refused to do. It appears that Guaymas was the nearest port at which the cargo could have been discharged; but as the ship was short of coal, and it was doubtful whether she could get any there, the owner concluded to go to San Francisco, which he did, being obliged to stop for coal at San Diego, on the way.

The evidence shows that the failure to discharge the cargo within the lay days was due partly to the fault of the ship, and partly to the fault of the consignee. In the first place, the baskets used by the ship in discharging were insufficient in size for the purpose. Their capacity was only about 150 pounds. In the second place, for three and a half of the lay days, the ship was derelict for lack of men. January 28th, 29th, and 30th, and February 2d, but one hatch was used, for want of men to work another. This was clearly the fault of the ship. On the other hand, the lighters furnished by the consignee were inadequate to the purpose. As that was the only means of discharging, the duty devolved upon the consignee to provide lighters of sufficient capacity to receive the cargo at the ship's side in the way such a cargo is usually discharged,—through chutes. The evidence, I think, shows that the cargo could and would have been discharged within the lay days, had the lighters been of sufficient capacity, notwithstanding the fact that the baskets used by the ship were also insufficient in size, and notwithstanding the further fact that for three and a half of the lay days but one hatch was worked, for want of men. But it is also true, I think, that the cargo could and would have been discharged within the lay days, by means of the lighters that were furnished by the consignee, had the ship used proper baskets and enough men to work two hatches. The failure

to discharge the cargo within the lay days being due in part to the fault of each party, neither, in my opinion, should be allowed demurrage.

The lay days having expired, less than half of the cargo having been discharged, and the storm having abated, what, on February 10th, were the obligations and rights of the respective parties? That the obligation of the consignee to furnish proper and sufficient means for the reception of the cargo at the ship's side continued, seems to me to be clear. The consignee was not relieved of that obligation by the fact that the discharge of the cargo was not completed within the lay days. The duty of delivering the cargo on shore did not, under the charter-party, devolve upon the ship. Her master, therefore, was not required to employ the canoes or dug-outs, referred to in the evidence, in which the coke might, at increased cost and delay, have been landed after having been put in sacks, which the ship did not, and was not required to, have. Those canoes or dug-outs, it seems from the evidence, were used by the Compagnie du Boleo for the purpose of discharging cargoes consigned to it in the interval between the destruction of the wharf, in February, 1890, and the procuring of the iron lighters; and, if they could have been used at the time in question for the purpose of discharging the balance of the cargo of the Scandinavia, it was the duty of the Compagnie du Boleo to have employed them, and not the duty of the ship. No effort on the part of the consignee was made after the storm to provide the ship with the means to discharge the balance of her cargo, upon which she had a lien for the balance of the freight. On the contrary, the claim and demand of the consignee's agent, daily repeated, was that the ship should seek and employ such means. This conduct on the part of the consignee, in view of the fact, apparent from the evidence, that the Compagnie du Boleo dominated Santa Rosalia; that it was the owner as well as the consignee of the cargo; that the ship was short of coal; and that the roadstead in which she lay was a dangerous place for her to stay,—was equivalent to a refusal to receive the balance of the cargo and to pay the balance of the freight. Under such circumstances, what was the ship to do? She could not be required to remain there forever. The consignee refused, after being requested to do so, to name a port to which the balance of the cargo should be taken. Under these circumstances, I think the master was justified in taking it to some place where it could be safely stored with a third party for the consignee, subject to the payment of the freight and charges. Ordinarily, such place should be the place nearest to the port of destination, where the cargo could be so discharged and stored; but the circumstances of the case may be such as to make that rule inapplicable. Here it appears that Guaymas was the nearest port to which the cargo could have been discharged and stored; but it also appears that the ship was short of coal, and it was doubtful whether she could get a supply at that port. For aught that appears, the ship may not have been provided with means to pay the necessary cost of lighterage there. Nor was she required to be so provided; for, under the charter-party, her cargo was stipulated to be delivered at the ship's side, not on shore. The true rule, it seems to me, is

given in a note by Judge SHIPMAN to the case of *Fox* v. *Holt*, 4 Ben.: 300,—that in a case like the present the master is authorized to land and store the cargo at the nearest proper and convenient port, having reference to his own convenience and the apparent best interests of the owner;· always, of course, acting prudently and in good faith.   The selection of San Francisco, where lighterage was not necessary, and where there was every facility for discharging and storing and selling the cargo, came, I think, within this rule, considering all of the facts and circumstances of the case.   Upon the arrival of the ship there, the master could "have landed the balance of the cargo, and placed it in charge of a third person, and, if the freight money continued to be withheld, the owner of the vessel could have kept it in that condition, or libeled it, had it sold by a decree of the court, and thus obtained the freight money."   *Fox* v. *Holt*, Id. 299.   In this case, after the filing of the libel and cross-libel, the balance of the cargo in question was sold under stipulation of the respective parties.   Out of its value, I think, should be paid the balance of the freight earned under the charter-party, together with freight on the 332 500-2240 tons from Santa Rosalia to San Francisco, and the charges incident to the discharging at the latter port.   These amounts must be ascertained by proof before the commissioner.   Should the freight and charges exceed the value of the coke at San Francisco, the owner of the ship will be entitled to a decree for the difference, and to costs.   A reference will be made to the commissioner for the purpose above indicated, and upon the coming in of his report a decree will be entered in accordance with this opinion.