H. T. HANSEN, MASTER, ETC., BARK TILLIE BAKER,

*v.*

NINE HUNDRED AND NINETY-EIGHT TONS OF COAL.

---

San Juan, No. 935, in Admiralty.

ON CLAIM OF DEMURRAGE.

Admiralty.

  1. Discharge of cargo is a matter coming up under the charter party. The delivery to the consignee is a matter coming up under bill of lading.

Freight—Demurrage.

  2. Where freight is paid after the suit is brought, it does not enter into the case except in the matter of ·osts.

Captain—Waiver.

  3. A waiver of demurrage will control the ship, but a waiver on condition will not control, unless afterwards reaffirmed.

Demurrage.

  4. The vessel is not liable for delay due to insufficiency of wharf or carts for hauling.

Freight—Cargo.

  5. Freight is due from the cargo at the time and place where the cargo is unloaded, unless otherwise agreed. The adjustment of accounts between the formal and the real consignee is no concern of the vessel beyond allowing a short reasonable time for them to communicate. A reasonable time should be allowed for examination of the cargo.

Hansen v. 998 Tons of Coal.

Ship—Cargo.

6. A vessel performs her duty when she discharges the cargo, and it is not her duty to count it or weigh it.

Negotiations—Compromise.

7. Juristic rights are suspended during negotiations for a compromise, and evidence of the negotiations is not permissible.

Demurrage—Sundays.

8. Sundays and holidays are excepted from the lay days of a vessel, but not from the time of demurrage.

Ship—Charter Party.

9. The liabilities of the ship are controlled by the charter parties, which call for discharge of the cargo, and not for the delivery to the consignee. Any disputes between the consignees must be settled outside.

Opinion filed November 7, 1913.

Mr. *Jos. Anderson, Jr.,* for libellant.

Messrs. *Alvarez Nava & Dominguez* for respondents.

HAMILTON, Judge, delivered the following opinion:

The libel *in rem* filed January 15, 1913, sets up that the owners of the Tillie Baker on November 14, 1912, chartered to the Consolidation Coal Company the Tillie Baker for a voyage from Philadelphia to San Juan. The charter party annexed to the libel calls for freight at the rate of $2.40 per ton of 2,240 pounds of coal, which was to constitute the cargo. The charterers were to pay the vessel's Porto Rican port charges, freight was payable on proper delivery of cargo, and vessel to be free of all wharfage and lighterage charges. The vessel

was to discharge at San Juan 100 tons per day, Sundays and legal holidays excepted, the lay days commencing from the time the captain reports himself ready and prepared to discharge cargo. For every day's detention by default of the Consolidation Coal Company, or agent, $58 day by day should be paid by said Consolidation Coal Company, or agent, to the parties of the first part. The cargo was to be delivered alongside within reach of the vessel's tackle, vessel to haul to wharf designated by charterers to discharge cargo, provided there was sufficient water, and if moved again charterers to pay towage.

So far the charter party. The master, H. T. Hansen, issued five bills of lading on November 22, all of one tenor, for 998 tons of Somerset coal in the hold, which he promised to deliver in good order unto the "American Railroad Company of Porto Rico for the Porto Rico Brewing Company, San Juan, Porto Rico, or to his or their assigns, he or they paying freight on delivery of same."

The vessel accomplished her voyage safely, and arrived at San Juan on December 17, 1912. The testimony seems to show that the captain reported to the consignee the next day, saying that he was ready. There was some testimony that the piston rod of the gasolene winch was out of order, but it was repaired at once, and in any event the captain claims he could borrow and use a hand winch. The consignee and the captain went to see the captain of the port, and the vessel was given a berth at what was called the Quartermaster Dock, at the stern of a barkentine already there, named the Minnie Swan. The Baker went in and dropped anchor on the 18th, and the stern of the vessel was hauled in early on the 19th. The result was that she had to lie with her bow on the outside of the barken-

tine, and it was found impracticable to turn the vessel around. As the Minnie Swan was·to clear in a couple of days, the captain agreed to wait that length of time, so as to get the full berth. Instead of this, however, a five-master came in, with coal for the consignee, and the consignee then had the Baker moved to a small wharf called Under the Hopper. There she actually began to discharge the coal on December 23 at 1 o'clock P. M. This wharf was 14 feet wide, and there could be used but one cart at a time, for lack of room for two to pass.

On the 4th of January the captain wrote the consignee that the Tillie Baker was ready and prepared to discharge cargo on the 21st of December, and that at the rate of 100 tons per day the time for discharging expired on the day the letter was written. And he, therefore, claims demurrage from Monday, January 6th, according to the charter party. The unloading was actually finished on January 9th at 3:30 P. M. Although he requested it, the captain was not given his receipt for the cargo until January 18th. In the meantime the captain had filed this libel on the 15th, seeking to recover freight and demurrage.

1. This is a suit *in rem,* in which a vessel seeks to recover freight and demurrage from the cargo after discharge. It is defended by the charterer, by the nominal, and also by the real, consignee. The first aspect of the case which presents itself relates only to the charter party, for it concerns the discharge of the cargo, which the vessel was, under the charter party, bound to effect at 100 tons per day. As to this, the question is as to delays due to the vessel, and delays due to the nature of the wharf, which the charterer was to provide. At present, therefore, the question is not as to delivery of the coal to the

consignees under the bill of lading, but the discharge of the vessel in accordance with the charter party.   275 Tons of Mineral Phosphates, 9 Fed. 209.

2.  Looking at the terms of the charter party, which was the contract between the Consolidation Coal Company, who furnished the cargo, and the owners of the bark Tillie Baker, we find that the Consolidation Coal Company were to pay $2.40 freight per ton delivered and Porto Rican port charges.   Furthermore, that for discharging at San Juan 100 tons per day were allowed, Sundays and legal holidays excepted.   That the lay days commenced from the time the captain reported himself ready and prepared to discharge, and that for each day's detention by default of the Consolidation Coal Company demurrage was to be paid at the rate of $58.   The vessel was to be hauled to the wharf designated by the Consolidation Coal Company, and delivery of the cargo was to be alongside within reach of vessel's tackles.

Freight need not be further considered except in the matter of costs, because settled after the filing of the libel; but there is a great difference between the parties as to demurrage.   At 100 tons per day, the vessel should finish in ten lay days, but, commencing on the 23d of December, Christmas, New Year's and two Sundays intervened.   The earliest that she could have finished, therefore, under the charter, would have been fourteen days.

3.  It is quite possible that the vessel was ready on December 21st, after she had been hauled to the Quartermaster Dock. The captain's waiver of two days at that dock in order to let the Minnie Swan get out of the way might not have been binding when another vessel was put in the place of the Minnie

Swan; but at all events the captain later reaffirmed his waiver, and, as he controls the vessel, no demurrage will be allowed as to this period. Davis v. Wallace, 3 Cliff. 123, Fed. Cas. No. 3,657.

4. The evidence seems to show that the vessel was then delayed by putting her at the dock called Under the Hopper, where the facilities did not permit the unloading of the 100 tons a day called for by the charter party, and which it seems the vessel could discharge. Only one hatch could be used at a time, the wharf was so small that carts could not pass each other, and these were so small that they had to be built up with planks, which resulted in breakdowns and loss of some coal. The Glenfinlas, 1 C. C. A. 85, 1 U. S. App. 22, 48 Fed. 758. It is true that the gasolene winch of the vessel did not always work smoothly. There was delay every day or two, lasting from a few minutes to an hour, but not more than one day can be attributed to this cause, and the rest was due to, insufficiency of the dock. It was, under the charter, the duty of the charterer or his agent to furnish a proper wharf or dock. Lindsay v. Cusimano, 12 Fed. 504. The result is therefore that the delay from the 7th of January to the 9th, that is three days, should be charged as demurrage.

5. The case is complicated by the fact that, although it is in the first instance one between the vessel and the charterers, the bills of lading were to be signed by the vessel, and this resulted in conferring rights upon the consignees for proper delivery of the cargo. It is in this way that not only the charterer intervenes, but also the nominal consignee, the American Railroad Company, and the real consignee, the Porto Rico Brewing Company. They practically stand in the place of

the charterer. Freight was all that the vessel could demand
of the charterer. There was a dispute whether this was payable
at San Juan or in Philadelphia. The freight itself was paid
on January 18th, two days after the libel was filed, and is not
now in question; but demurrage for the nine days' delay is
claimed by the vessel. Freight is due from the cargo, and is
consequently due at the time and place where the cargo is un-
loaded. Hughes, Admiralty, p. 146. The vessel had the right,
therefore, to demand the freight at the time of discharge, and
the delay in payment could be properly claimed as demurrage.
It would seem that the freight was finally paid in the United
States, but there is nothing in the evidence to remove the in-
ference, properly drawn from the papers, that it was payable
at San Juan. As a matter of convenience, everything at San
Juan was looked after by the consignees, and for the purposes
of this case they were the agents of the charterer, the Consoli-
dation Coal Company. It may be that as between them time
was necessary for adjustment of accounts, but this is no concern
of the vessel. The most that the court is disposed to do is to
allow twenty-four hours' leeway for communication between
the two consignees as to who should carry out the burden im-
posed by the charter party. It is usual also to allow a reason-
able time for examination of the cargo. This it is which in
the eye of the law converts the discharge of the cargo into de-
livery. There is little evidence what time is reasonable in
this case, but as the carts were small and the coal could have
been inspected as it was hauled from the wharf, there seems to
be no reason for allowing more than twenty-four hours for this
purpose. From the nine days' delay, therefore, there may be
subtracted two days for these reasons. This will leave seven

Hansen v. 998 Tons of Coal.

days' demurrage to be charged against the cargo and its claimants.

6. The consignees being admitted to defend, it might well be that any complaint they have to make against the vessel under the bill of lading can be offset against the claim of the vessel for the freight which it may be the consignees have to pay by their subcontract with the charterer, the Consolidation Coal Company. They set up that the coal was not weighed by the vessel when discharged, and that there was for a while an apparent shortage of 58 tons. All the coal was discharged out of the vessel. Not only is there no proof that any had been abstracted during the voyage, but the 58 tons were found. The vessel performed her duty when she discharged the cargo. It is not her duty to count it or weigh it. If important, this could have been done by the consignees as the carts carried the coal off. It is true that the delivery of freight under bill of lading implies mutual acts. There must be acceptance as well as delivery. Salmon Falls Mfg. Co. v. Tangier, Fed. Cas. No. 12,265; Ostrander v. Brown, 15 Johns. 39, 8 Am. Dec. 211. The ship cannot recover demurrage in any case where the delay was caused by its master. Whitman v. Vanderbilt, 21 C. C. A. 422, 38 U. S. App. 693, 75 Fed. 422; Ray v. One Block of Marble, 19 Fed. 525; The Scandinavia, 49 Fed. 658. But on the other hand, the same is true of the consignee. Nothing is shown which was the fault of the vessel, to account for the delay in settling the freight.

7. The point is raised that the captain agreed to accept one day's demurrage. But this was based upon having the freight paid promptly at that time, which was not done. The general rule is that no evidence is admissible as to negotiations

VI. Porto Rico—26.

for a compromise, if the compromise is not actually effected. Juristic rights, so to speak, are ·in such case suspended, and everything connected with the negotiations are as if they had not occurred. The law encourages attempts to settle disputes amicably.

8. While Sundays and holidays are excepted from the lay days of a vessel, this is not so in demurrage. After the discharge, delays are to be counted day by day. In this case it would be from the 9th to the 18th, less one day above allowed, that is to say, eight days. The Oluf, 19 Fed. 459; The Dixie, 46 Fed. 403; The Kimball, 3 Wall. 43, 18 L. ed. 53; Sears v. 4,885 Bags of Linseed, 1 Cliff. 68, Fed. Cas. No. 12,589.

9. The document controlling the case between the Consolidation Coal Company, which at that time owned the coal, and the vessel itself, is the charter party. No injury is shown to the consignees as such, and they are in the case less as consignees than as agents of the charterers. The charter party calls not for delivery to the consignee, but for discharge of the cargo, and this was complete when the cargo went over the ship's side and got beyond the reach of the ship's tackle. The bills of lading are signed without prejudice to the charter, and the vessel by the terms of the charter has an "absolute lien on cargo for all freight, dead freight, and demurrage." No question has been raised as to whether this lien was lost when the cargo was removed beyond the ship's tackle and became a part of the general property on land. The Kimball, 3 Wall. 43, 18 L. ed. 53. So far as the pleadings of this case are concerned, questions between the charterer or owner and the other defendants as consignees must be settled outside. This suit is properly brought by the vessel against the cargo for freight

and demurrage. Hughes, Admiralty, 146; Brittan v. Barnaby, 21 How. 527, 16 L. ed. 177.

The result, therefore, is that, taking into account all delays, the vessel is entitled to ten days' demurrage at $58 a day, and a decree will be entered accordingly.